## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

BERT GREEN and LINDA GREEN,     )
                                 )
       Plaintiffs,          )
                                 )
v.                           )     Case No.:  2:14-cv-00449-SGC
                                 )
FIVE STAR MANUFACTURING, INC.,     )
                                 )
       Defendant.         )

## <u>MEMORANDUM OPINION</u>[1]

     This is a products liability action brought by Bert and Linda Green against Five Star Manufacturing, Inc.  It is before the undersigned on Five Star's (1) motion to preclude the expert testimony of Peter J. Leiss (Doc. 19), (2) motion for summary judgment (Doc. 20), (3) motion to strike the affidavits of Bert Green and Leiss submitted in opposition to its motion to preclude and motion for summary judgment (Doc. 29), and (4) motion for leave to file a reply brief in support of its motion for summary judgment that exceeds the page limitation established by the initial order governing this case (Doc. 30).  The last enumerated motion is unopposed and due to be granted for good cause shown.  For the reasons discussed below, the motion to strike the affidavits of Bert Green and Leiss is due to be granted in part and denied in part, the motion to preclude Leiss's expert testimony is due to be granted in part and denied in part, and summary judgment is due to be granted in Five Star's favor on all claims.

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 15).

I. <u>Facts</u>

Viewed in the light most favorable to the plaintiffs and giving the plaintiffs the benefit of all reasonable inferences, the relevant facts are as follows: Bert Green purchased a set of two ramps manufactured by Five Star from a third-party retailer some time before 2004.  (Doc. 21 at ¶ 3; Doc. 28 at ¶ 3).  The ramps, which may be used to load a riding lawnmower onto the bed of a pickup truck, arch at the top to sit on a tailgate.  (*See* Doc. 21-2 at 6).  The model Green purchased came equipped with steel safety cables intended to secure the ramps to a truck bumper.  (Doc. 21 at ¶ 3; Doc. 28 at ¶ 3).  In 2003 or 2004, Five Star substituted nylon safety straps for steel safety cables.  (Doc. 21 at ¶ 3; Doc. 28 at ¶ 3).

Five Star would have sold the ramps to the retailer packaged in cardboard, and a safety manual would have been attached to the ramps.  (Doc. 21 at ¶¶ 4-5; Doc. 28 at ¶¶ 4-5).  However, Green did not receive the packaging or safety manual, presumably because he purchased the ramps off the floor, where the retailer had set them up as a display model.  (Doc. 21 at ¶ 2; Doc. 28 at ¶ 2).  Both the packaging and the safety manual include a depiction of the ramps attached to a truck with the steel safety cables.  (Doc. 21 at ¶¶ 4, 6; Doc. 28 at ¶¶ 4, 6).  Additionally, the packaging contains the verbiage "Be sure to always use your safety cables when loading and unloading equipment," while the safety manual instructs the user to "[a]ttach safety cables to the bumper or frame of the truck or trailer. . . . to keep the ramps in place until the weight of the equipment you are loading/unloading is on the ramps."  (Doc. 21 at ¶¶ 4, 6; Doc. 28 at ¶¶ 4, 6).  A decal on each ramp itself cautions the user to read the safety manual and warns that the "safety cable must be present and hooked."  (Doc. 21 at ¶ 7; Doc. 28 at ¶ 7).  As packaged—and as sold to Green—each safety cable, made of steel, was attached to a ramp.  One

end was looped around part of a ramp and secured with a cable clamp.  The other end, to which a hook had been pressure fitted, was hooked to the ramp.  (Doc. 21 at ¶ 11; Doc. 28 at ¶ 11).

On March 18, 2012, Green was using the ramps to load his riding lawnmower into the bed of his pickup truck.  (Doc. 21 at ¶ 22; Doc. 28 at ¶ 22).  He did not secure the ramps to his truck with the steel safety cables.  (Doc. 21 at ¶ 22; Doc. 28 at ¶ 22).  One of the ramps shifted, causing the lawnmower to come off the ramps.  (Doc. 21 at ¶ 22; Doc. 28 at ¶ 22).  Both the lawnmower and Green, who was riding the lawnmower, fell to the ground, and the lawnmower fell on top of Green.  (Doc. 21 at ¶ 22; Doc. 28 at ¶ 22).  Green claims to have sustained physical injuries as a result.  (Doc. 21 at ¶ 22; Doc. 28 at ¶ 22).  He commenced this action against Five Star, stating a claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), as well as claims for negligent and wanton design and failure to warn, breach of express warranty, and breach of implied warranty.  (Doc. 1).  Also included in the complaint is a claim for loss of consortium asserted by Green's wife.  (*Id.*).

When deposed, Green initially testified he either never read the on-product warning that the "safety cable must be present and hooked" or could not remember whether he had read the warning.  (Doc. 22-1 at 13-14, 21).  Later, when questioned by his own attorney, Green testified he did read the warning and believed he had complied with it because the cables were present and hooked—albeit to the ramps themselves—when he purchased the ramps.  (*Id.* at 34-35).  Green also testified he believed the purpose of the steel cables was to support the weight of equipment being loaded via the ramps or increase the structural stability of the ramps.  (Doc. 22-1 at 22-23).  During his deposition, Green was shown the depiction of the steel safety cables connecting the ramps to a truck that is included in the safety manual and asked whether he would have understood from the depiction that the cables should have been connected to the bumper of

his truck.  (*Id.* at pp. 23-24).  Green stated, "From the work that I have done with steel, no, it would not be run to the bumper."  (*Id.*).  He also was shown the verbiage in the safety manual instructing the user to "[a]ttach the safety cables to the bumper or frame of the truck or trailer." (*Id.* at 24).  When asked whether he would have understood from the verbiage that the cables were supposed to connect the ramps to his truck, the following exchange ensued:

> A. Well, that all depends.  No, I wouldn't agree with that.
> Q. So, even if you had received this brochure and read it, would you have still set the ramps up the way you did on the day of the accident?
> A. Well, I didn't get this.
> Q. I know.
> A. And to be honest with you, I don't know.

(*Id.*).

To support his claims, he has submitted the expert report of Peter J. Leiss, a licensed professional engineer employed by Robson Forensic, Inc.  (Doc. 28-4).  In the report, Leiss offers the following opinions regarding the ramps: (1) Five Star failed to conduct a proper hazard analysis of the ramps and, thereby, breached the standard of care applicable to a product manufacturer; (2) the ramps are unsafe as designed because (a) the diameter and material of the safety cables render the cables structural in appearance, (b) tools are required to adjust the safety cables, and (c) the warnings affixed directly to the ramps are incomplete and misleading because they do not indicate to what the cables should be attached; and (3) easily adjustable nylon safety straps are a technologically and economically feasible safer design alternative.  (*Id.* at 9-15).  Dr. William Vigilante, the head of Robson's human factors group, peer-reviewed Leiss's report. (Doc. 19-5 at 11).

## II. Discussion

### A. Motion to Strike

#### 1. Green's Affidavit

In his affidavit submitted in opposition to Five Star's motion to preclude and motion for summary judgment, Green states (1) he was not asked any hypothetical questions about nylon straps during his deposition, (2) he has now seen photographs of the nylon straps Five Star substituted for steel cables not long after he purchased the ramps in question, and (3) he would have used nylon straps to secure the ramps to his truck because unlike the steel cables, they do not appear to be part of the structure of the ramps. (Doc. 27-5 at 2-3). Five Star argues Green's statement he would have used nylon straps to secure the ramps to his truck is speculative and conclusory. (Doc. 29 at 2-4). It further argues the statement contradicts Green's deposition testimony, which it characterizes as demonstrating Green did not contemplate a need for securing the ramps to his truck and would not have done so even if he had read the owner's manual. (*Id.* at 4-6).

"When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir.1984). A court must " 'find some inherent inconsistency between an affidavit and a deposition before disregarding an affidavit' and state that if no such inherent inconsistency exists, 'any conflict or discrepancy between the two documents can be brought out at trial and considered by the trier of fact.'" *Santhuff v. Seitz*, 385 Fed. App'x 939, 944-45 (11th Cir. 2010) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)). Moreover, speculation and conclusory statements in

an affidavit are inadmissible.  *See Reliance Nat'l Indem. Co. v. Pinnacle Cas. Assur. Corp.*, 160 F. Supp. 2d 1327, 1332 (M.D. Ala. 2001) (speculation inadmissible); *Ojeda v. Louisville Ladder, Inc.*, 410 Fed. App'x 213, 215 (11th Cir. 2010) (evidence presented in opposition to summary judgment motion cannot consist of conclusory allegations).  The affidavit statement Five Star challenges, which addresses nylon safety straps, is not necessarily inherently inconsistent with Green's deposition testimony, which addresses steel safety cables.  However, that statement is both speculative and conclusory.  What Green believes he would have done if his ramp had been equipped with nylon straps, as opposed to steel cables, is not rooted in fact.  It is pure conjecture. Therefore, Green's affidavit is inadmissible.

### 2. Leiss's Affidavit

Leiss's affidavit submitted in opposition to Five Star's motion to preclude and motion for summary judgment contains 69 paragraphs addressing Leiss's education and professional experience, as well as the report he submitted in connection with this action and Five Star's criticism of that report.  (*See* Doc. 27-1).  Five Star argues Leiss's affidavit is an untimely disclosure under Rule 26 of the *Federal Rules of Civil Procedure*, contradicts his deposition testimony, relies on Green's inadmissible affidavit, and contains statements inadmissible for a variety of reasons.  (Doc. 29).

Rule 26 of the *Federal Rules of Civil Procedure* requires a party to submit and appropriately supplement an expert report that contains "a complete statement of all opinions the witness will express and the basis and reason for them" within the time prescribed by the trial court, FED. R. CIV. P. 26(a)(2)(B), (D) & (E), and Rule 37 of those same rules precludes a party from using information not provided in accordance with Rule 26 absent substantial justification or harmless error, FED. R. CIV. P. 37(c)(1).  While the Eleventh Circuit has held a supplemental

expert report may be excluded pursuant to Rule 37(c) if not timely filed, *see Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007), courts also have denied motions seeking to preclude consideration of expert affidavits on untimeliness grounds where the affidavits did not offer new opinions.  *See Rockhill-Anderson v. Deere & Co.*, 994 F. Supp. 2d 1224, 1239 (M.D. Ala. 2014) (denying motion to strike experts' affidavits as untimely where "[t]he overall opinions expressed in the affidavits [were] consistent with previously disclosed reports and deposition testimonies"); *Lidle ex rel. Lidle v. Cirrus Design Corp.*, 2010 WL 2674584, at *7 (S.D.N.Y. July 6, 2010) ("Courts in this district have held that where an expert affidavit expounded a wholly new and complex approach, as opposed to merely supporting an initial position, the expert's affidavit should be stricken.  However, where an expert's affidavit provides evidentiary details for an opinion expressed in his expert report, those portions of his or her affidavit can be considered." (internal quotation marks and alterations omitted)).  Review of Leiss's affidavit reveals that, contrary to Five Star's assertion, Leiss does not offer any new opinions.  Rather, he provides greater detail regarding his qualifications to testify as an expert witness in this action and the methodology he claims to have applied in forming the opinions contained in his report.  Accordingly, it is appropriate to consider the affidavit to the extent it is otherwise admissible.

Five Star makes a number of arguments regarding the admissibility of specific statements contained in Leiss's affidavit.  Some are meritorious, while others are not: Given Green's affidavit is inadmissible, those paragraphs of Leiss's affidavit referencing and relying on Green's affidavit (Doc. 27-1 at ¶¶ 67-69) are inadmissible.  Furthermore, Leiss's statements that Five Star was "negligent" in designing and testing the ramps and created a "defective" and "unreasonably dangerous" product (Doc. 27-1 at ¶ 41) are inadmissible legal conclusions.  *See Strickland v.*

*Royal Lubricant Co.*, 911 F. Supp. 1460, 1469 (M.D. Ala. 1995) (holding affiant's purported opinion regarding adequacy of product warning was inadmissible to extent intended as statement warning was "inadequate," as that term is defined under Alabama law); *Griffin v. City of Clanton, Ala.*, 932 F. Supp. 1357, 1358-59 (M.D. Ala. 1996) (holding affiant's purported opinions officers acted carelessly, recklessly, unreasonably, and with deliberate indifference were inadmissible legal conclusions).

What remains does not inherently contradict Leiss's deposition testimony. Five Star's contention that Leiss's report and deposition testimony indicate his opinions are based on a single authoritative source at the same time his affidavit indicates he relied on several sources and methods (Doc. 29 at 8-9) is a mischaracterization. While Leiss specifically cited only one authoritative source in his report and deposition testimony, he indicated additional sources, similar in substance to the source identified, support his opinions. (Doc. 19-3 at 11-12; Doc. 19-5 at 23). Accordingly, his identification of those additional sources in his affidavit does not contradict his prior statements. Furthermore, rather than identify new methodologies relied on to form his opinions, Leiss expands on the hazard analysis identified in his report and deposition as the basis of his opinions.

Five Star argues the statements in Leiss's affidavit as to his qualifications are irrelevant, argumentative, conclusory, and self-serving. (Doc. 29 at 12). On the contrary, the additional details the affidavit provides about Leiss's education and professional experience are relevant to Five Star's argument Leiss is not qualified to offer expert testimony in this case, even if their inclusion in the affidavit is "self-serving" in the sense they lend support to the plaintiffs' position. Moreover, because as discussed below, Leiss's report and deposition testimony provide a sufficient basis for determining he is qualified to offer the opinions expressed, this

argument is of no consequence.  Likewise, while Five Star moves to strike those portions of the affidavit reciting and commenting on the deposition testimony of Jim Woodward, Five Star's corporative representative, on the grounds they are argumentative and contain improper hearsay (*id.* at 12-13), their propriety is irrelevant because they are not dispositive to any party's position regarding the motion to preclude or motion for summary judgment.

Five Star also seeks to strike those portions of the affidavit regarding Leiss's experience as a product engineer on the grounds the opinion for which that experience provides a foundation—that Five Star breached the standard of care applicable to a product manufacturer— is irrelevant to this case.  (*Id.* at 10-11).  This argument implicates the merits of Five Star's motion to preclude Leiss's expert report.  Five Star's argument that those portions of the affidavit addressing Leiss's experience with human factors analysis are due to be struck because Leiss is not qualified to offer a human factors analysis of the ramp (*id.* at 13) also goes to the merits of that motion.  Consideration of the motion, undertaken below, is the most logical and efficient way of addressing, albeit indirectly, these arguments.

### B. Motion to Preclude

Rule 702 of the *Federal Rules of Evidence* governs the admission of expert testimony.  It was amended in 2000 in response to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, (1993), and the cases applying *Daubert*, including *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1990).  *See* FED. R. EVID. 702 advisory committee's note to 2000 amendment.  In *Daubert*, the Supreme Court held a trial court must ensure scientific expert testimony is both reliable and relevant.  526 U.S. at 589-95.  In *Kumho Tire*, the Supreme Court held the "gatekeeping" obligation imposed on trial courts by *Daubert* applies not only to testimony based on scientific

knowledge, but also to testimony based on technical and other specialized knowledge.  526 U.S. at 141.  In its current version, Rule 702 provides:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  To fulfill its gatekeeping obligation under *Daubert*, a trial court must undertake a "rigorous inquiry" to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (internal quotation marks omitted).  The party offering the expert has the burden of proving each of the foregoing elements by a preponderance of the evidence.  *Id.* at 1292.

Five Star argues the court should preclude Leiss's testimony because he is not qualified to offer the proffered opinions, which, in any event, are unreliable and irrelevant.  (Doc. 19-1).  It argues Leiss is unqualified because he has no experience with the design of lawnmower loading ramps or experiential knowledge of the industry and because his opinions essentially are the product of a human factors analysis with which he has no experience, either.  (*Id.* at 9-14).  It argues Leiss's proffered opinions regarding the ramps' design defects and a safer alternative design are unreliable because they are based on speculation, rather than any reliable methodology.  (*Id.* at 14-21).  Finally, it argues Leiss's opinion Five Star breached the standard

of care for a product manufacturer by failing to conduct a proper hazard analysis is irrelevant because the sale of a defective product establishes liability under the AEMLD, regardless of a defendant's conduct in designing or manufacturing the product.  (*Id.* at 21-23).[2]

## 1. Leiss's Qualification

Various considerations may qualify an individual to offer expert testimony on a subject. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing plain language of Rule 702).  "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status."  *Id.* at 1260-61.  Leiss is a licensed professional engineer employed by Robson Forensic, Inc.  (Doc. 19-3 at 3).  He has a bachelor's of science degree in mechanical engineering and 15 years of experience in the design, development, and manufacturing of vehicles, including as a plant vehicle engineer, vehicle development engineer, and product engineer with Chrysler, LLC, and a test support engineer with General Motors Corporation.  (*Id.* at 3, 17-18).  His experience includes the design and implementation of vehicle safeguards intended to benefit consumers, as well as the preparation of warnings and instructions that accompany those safeguards.  (*Id.* at 3).  This experience qualifies him to offer opinions as to the design of the ramp and its on-product warnings from a consumer safety perspective.

Five Star's emphasis on Leiss's lack of experience with the design of ramps, specifically, relies on *Beam v. McNeilus Truck and Mfg., Inc.*, in which this court held a mechanical engineer could not offer expert testimony regarding the design of a garbage truck because he had little or

---

[2] Although the plaintiffs request oral argument on Five Star's motion to preclude, the undersigned concludes a hearing is not necessary, given Leiss has had the opportunity to explain his opinions in his report, during his deposition, and through his affidavit.  *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) ("*Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses." (internal quotation marks omitted)); *United States v. Junkins*, 537 F. Supp. 2d 1257, 1259 (S.D. Ala. 2008) ("It is well established that a hearing is not required every time a party invokes a *Daubert*-type objection.").

no experience with the design of garbage trucks, 697 F. Supp. 2d 1267, 1225-28 (N.D. Ala 2010).  However, this court also has noted:

> it is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render an opinion because the witness lacks expertise in specialized areas that are directly pertinent to the issues in question, if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question.

*Thomas v. Evenflo Co.*, 2005 WL 6133409, at *6 (N.D. Ala. Aug. 11, 2005) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001), *aff'd*, 205 Fed. App'x 768 (11th Cir. 2006).  *See also United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013) (holding trial court erred in excluding chemical engineer's interpretation of engineering documents for manufacturing chlorinated polyethylene because "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility").  In this case, the undersigned is satisfied Leiss's experience assessing vehicle product designs for consumer safety and implementing protections against design hazards qualifies him to offer testimony regarding the design of a relatively simple product intended to be used in connection with a vehicle from a consumer safety perspective.

## 2. <u>Reliability  & Relevance of Leiss's Opinions</u>

In assessing reliability, it is "[n]ot the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence," *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003), but "[t]o see if how [an expert] got to where he ended up makes reasoned, scientific sense," *McCreless v. Global Upholstery Co., Inc.*, 500 F. Supp. 2d 1350, 1353 (N.D. Ala. 2007).  In doing so, a court may consider whether the methodology employed by the expert (1) can be tested, (2) has been subjected to peer review, (3) has a known or potential rate of error, and (4) is generally accepted by the relevant expert

community.  *Daubert*, 509 U.S. at 593-94.  "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."  *Frazier*, 387 F.3d at 1262.  Although an expert's experience may support his opinions, experience alone does not necessarily "render[] reliable *any* conceivable opinion the expert may express."  *Id.* at 1261 (emphasis in original).  An expert who relies solely or primarily on experience " 'must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  *Frazier*, 387 F.3d at 1265 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment) (emphasis added in *Frazier*).  The *ipse dixit* of a qualified expert is insufficient to establish reliability.  *Frazier*, 387 F.3d at 1261.  The trial court must do more than " 'tak[e] the expert's word for it.'"  *Id.* (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment).

In assessing relevance, a trial court should determine whether the expert testimony reflects specialized knowledge that will help the jury understand the evidence or determine a fact in issue.  *See* FED. R. EVID. 702.  Expert testimony is not helpful to the jury if it does not concern "matters that are beyond the understanding of the average lay person" or "offers nothing more than what lawyers for the parties can argue in closing arguments."  *Frazier*, 387 F.3d at 1262-63.  Nor is it helpful if it does not relate to any issue in the case.  *Daubert*, 509 U.S. at 591.

### a. Opinion Five Star Failed to Conduct Proper Hazard Analysis

The basis of Leiss's first opinion is his application of principles of product design, which he contends require a product manufacturer to undertake an engineering analysis to ensure the design of a reasonably safe product, to Woodward's testimony regarding the extent of testing Five Star conducted on the ramps.  (Doc. 19-3 at 10-12).  Although in his report, Leiss cites a

single treatise on human factors and engineering to support his opinion Five Star should have tested the ramp more rigorously (*id.* at 11-12), Leiss testified during his deposition that other texts espouse the same principles as the treatise identified (Doc. 19-5 at 23).   Leiss's application of general principles governing the development of a safe product to Woodward's testimony regarding the extent of testing conducted on the ramps constitutes a reliable application of reliable principles to sufficient facts.

Moreover, the opinion he reached as a result is relevant to this action.  Five Star argues the statements in Leiss's affidavit regarding the standard of care applicable to a product manufacturer are irrelevant because the gravamen of a products liability case is whether a product is defective or unreasonably dangerous, not whether the manufacturer was negligent. (Doc. 27 at 21-23; Doc. 29 at 10-11).  This argument ignores the additional tort claims, including ones for negligence and wantonness, asserted in this action that do involve a determination whether Five Star breached the standard of care for a product manufacturer.  For these reasons, Leiss may opine as to Five Star's compliance with the standard of care applicable to product manufacturers in developing and testing the ramps.[3]

### b. <u>Opinion Ramp is Unsafe as Designed</u>

It is clear the basis of Leiss's opinion the ramp is unsafe as designed is what he refers to interchangeably as a "hazard analysis," the Engineering Triad, the Safety Triad, and the Safety Hierarchy.  (*See* Doc. 19-5 at 28; Doc. 27-1 at 5).  According to Leiss, this methodology instructs that if a hazard is detected, it should be designed out; if it cannot be designed out, it should be guarded against; and if it cannot be guarded against, persons subjected to the hazard should be

---

[3] However, because as discussed below, Green has failed to produce sufficient evidence to support other elements of his negligent and wanton design and failure-to-warn claims, Leiss's opinion Five Star did not test the ramp sufficiently is ultimately irrelevant.

warned about it. (Doc. 19-5 at 28; Doc. 27-1 at 5). Leiss states this methodology has been described in authoritative texts and articles since at least 1955, when its general principles were cited in the National Safety Council's Accident Prevention Manual for Industrial Operations as three of four general rules. (Doc. 27-1 at 5). In addition to this methodology, Leiss cites a paper presented at a meeting of human factors engineers, which found the rate of compliance decreased as the cost of compliance increased, to support his opinion that the necessity of tools to adjust the safety cables renders the ramps unsafe. (*Id.* at 10). He further notes it is widely accepted in product engineering that concise, on-product instructions and warnings are necessary to support his opinion the ramps' on-product warnings are incomplete and misleading. (*Id.*). Leiss researched regulations, standards, and authoritative works applicable to ramps, specifically (Doc. 27-1 at 8), but found none (Doc. 19-5 at 14).

With the foregoing methodology and principles as his guide, Leiss reviewed certain deposition testimony and pleadings, as well as photographs of the ramps, the ramps' on-product warnings, and Green's truck, at which point he claims the ramps' defects became obvious to him. (Doc. 27-1 at 9). Leiss did not inspect the ramps before forming his opinions (Doc. 19-5 at 14), although he claims his inspection of the ramps after completing his report confirmed the conclusions he reached (Doc. 27-1 at 9-10). Leiss did not conduct any tests or calculations before completing his report. (Doc. 19-5 at 14). Although Leiss reviewed third-party testing performed on the ramps (Doc. 19-3 at 23), the plaintiffs concede the testing was of no significant value to Leiss's analysis (Doc. 27 at 4). Moreover, while Leiss investigated competitors' products (Doc. 27-1 at 9), he himself acknowledged that he did not use that research to form any of his opinions (Doc. 19-5 at 14).

The undersigned is willing to accept the so-called Safety Triad as a reliable methodology. However, Leiss has failed to reliably apply this methodology to sufficient facts or data. Nowhere in his report or affidavit or during his deposition did Leiss explain how or why the Safety Triad led to his conclusion the structural appearance of the steel safety cables, necessity of tools to adjust the safety cables, or substance of the on-product warnings renders the ramps unsafe. Moreover, he does not apply the purported inverse relationship between the cost of compliance and the rate of compliance to any objective facts or data in this case. He did not undertake a study to determine whether consumers found the safety cables confusing or too costly (in terms of time or energy) to use. (*See* Doc. 19-5 at 28).[4] Likewise, Leiss has failed to explain how or why the obvious necessity of concise, on-product instructions and warnings led to his conclusion the warnings on the ramps are incomplete and misleading. *See Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1102-03 (W.D. Okla. 2009), *aff'd*, 405 Fed. App'x 296 (10th Cir. 2010) (holding expert witness's opinion uncommon design of gear shifter made it unreasonably dangerous was not reliable because expert did not conduct any tests to confirm or quantify driver confusion, identify specifically applicable engineering standards, or apply engineering principles on which he purported to rely, including Safety Triad and hazard analysis considerations, to objective data). Finally, Leiss has explained neither how nor why his experience led to his conclusions, despite having had several opportunities to do so. In sum, there is an analytical gap in Leiss's report. *See General Elec. Co v. Joiner*, 522 U.S. 136, 146 (1997) (noting trial court "may conclude that there is simply too great an analytical gap between

---

[4] Both the plaintiffs and Leiss emphasize that Five Star produced limited information regarding the development and testing of the ramp design. (Doc. 27 at 21 n. 1; Doc. 27-1 at 7-9). To the extent the plaintiffs argue this excuses the gaps in Leiss's report, this argument must be rejected. Any lack of records or testing on Five Star's part does not permit Leiss to assert opinions without sufficiently explaining how or why he applied a hazard analysis to the facts and data he did have at his disposal to reach those opinions.

the data and the opinion proffered"); FED. R. EVID. 702 advisory committee's note to 2000 amendment (identifying factor relevant to determining reliability of expert testimony as whether expert "has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"); *McGee v. Evenflo Co., Inc.*, 2003 WL 23350439, at *14 (M.D. Ga. Dec. 11, 2003) (holding that while engineer's expert opinions may have been accurate, he had done nothing to show that they were), *aff'd*, 143 Fed. App'x 299 (11ᵗʰ Cir. 2005).  With nothing to breach the gap, Leiss's opinions regarding aspects of the ramps that render them unsafe are nothing more than *ipse dixit*.

Moreover, his opinions include *ipse dixit* regarding matters that are within a jury's common experience and knowledge.  The structural appearance of the steel safety cables and unclear and ambiguous nature of the substance of the on-product warnings are commonsense observations a jury may make.  *See Snoznik v. Jeld-Wen, Inc.*, 2010 WL 1924483, at *19 (W.D.N.C. May 12, 2010) (holding human factors expert's opinion instructions for operation of window were unclear and ambiguous were commonsense observations within realm of common experience and knowledge of jurors); *Jaquillard v. Home Depot U.S.A., Inc.*, 2012 WL 527421, at *5 (S.D. Ga. Feb. 16, 2012) (holding court could not allow witness to attach "expert" conclusion to opinion merely based on commonsense observation that water makes walking surfaces slippery).  For these reasons, Leiss is precluded from offering his opinion the ramps are unsafe as designed.

### c. Opinion as to Safer Alternative Design

In support of his third opinion, Leiss's report notes nylon straps have been used as tie-downs for objects and tarping for decades and that the proposed design alternative provides equipment similar to what most competitive products use.  (Doc. 19-3 at 13).  Leiss states this design alternative was technologically and economically feasible when Green bought the ramps.

(*Id.*).  It appears Leiss arrived at this opinion by noting some other ramp manufacturers use nylon safety straps and Five Star began using nylon safety straps not long after Green bought the ramps.  These mere observations do not constitute a reliable methodology from which an expert opinion as to a safer alternative design could be formed.  Leiss did not test the design he proposes against the design in question, nor did he cite testing anyone else undertook.  He has wholly failed to explain how he reached the conclusion ramps incorporating nylon safety straps are a safer design than ramps using steel safety cables.  Likewise, his assertion the design alternative he proposes was technologically and economically feasible when Green bought the ramps is no more just that—an assertion not grounded in any actual facts or data.  *See McCreless*, 500 F. Supp. 2d at 1357-58 (holding expert's opinion as to safer alternative chair design was inadmissible because expert failed to test proposed alternative design against design used by defendant).  Accordingly, Leiss is precluded from offering this opinion, as well.

### C. Motion for Summary Judgment

#### 1. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in [the non-movant's] favor."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks omitted).

The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the pleadings or filings the party believes demonstrate the absence of a genuine issue of material fact.  *Id.*  For an issue on

which the non-movant bears the burden of proof, the movant may meet its initial burden on summary judgment by demonstrating an "absence of evidence to support the non-moving party's case." *Id.* at 1115-16.  The burden then shifts to the non-movant to "show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party," or to "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17.  "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323-34.

### 2. <u>AEMLD, Negligence & Wantonness Claims</u>

To establish an AEMLD claim, a plaintiff must show the product in question was defective.  *Goree v. Winnebago Indus., Inc.*, 958 F.2d 1537, 1541 (11th Cir. 1992) (citing *Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.*, 395 So. 2d 991, 994 (Ala. 1981)).  A defective product is one that " 'does not meet the reasonable expectations of an ordinary consumer as to its safety.'"  *Goree*, 958 F.2d at 1541 (quoting *Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 133 (Ala. 1976)).  Otherwise put, a defect is " 'that which renders a product "unreasonably

dangerous," i.e., not fit for its intended purpose . . . ."" *Goree*, 958 F.2d at 1541 (quoting *Casrell*, 335 So. 2d at 133).  Three types of defects may give rise to liability under the AEMLD: (1) manufacturing defects, (2) design defects, and (3) failures to warn.  ALABAMA LAW OF DAMAGES § 32:10 (6th ed.).  Green alleges both a design defect—essentially, that the appearance of the steel safety cables makes it unclear the cables are intended to secure the ramps to a truck—and a warning defect—that the on-product warning that the "safety cables must be present and hooked" is incomplete and misleading.  It appears he may assert the warning defect only through the common law torts of negligence and wantonness.  (*See* Doc. 28 at 16).  However, in the interest of thoroughness, it will be addressed under the AEMLD, as well.

### a. Design Defect

To prove a design defect under the AEMLD or through the common law torts of negligence or wantonness, a plaintiff must show " 'a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product],'" by in turn showing " '[t]he plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design'" and " 'the utility of the alternative design outweighed the utility of the design actually used.'"  *Beam*, 697 F. Supp. 2d at 1275 (quoting *General Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003)).  The utility prong requires consideration of such factors as " 'the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect.'"  *Beam*, 697 F. Supp. 2d at 1275 (quoting *Jernigan*, 883 So. 2d at 662).

Whether Green has demonstrated the other requirements for maintenance of a design defect claim under the AEMLD and through the common law torts of negligence and wantonness—including that the appearance of the steel safety cables renders the ramps unreasonably dangerous or otherwise deficient and that Five Star did not undertake sufficient testing to design a safe product—he has failed to come forth with substantial evidence of a safer, practical, alternative design.   Absent Leiss's opinion that nylon safety straps were a safer, feasible alternative to steel safety cables, which is precluded by *Daubert* and its progeny, and Green's affidavit testimony he would have used nylon straps to secure the ramps to his truck, which is inadmissible speculation, the only evidence to support Green's proposed alternative design is the fact that Five Star substituted nylon safety straps for the steel safety cables not long after Green bought the ramps in question.   However, the mere existence of an alternative design does not demonstrate the utility of the alternative design outweighed the utility of the allegedly defective design (i.e., that the alternative design was of greater overall safety).   *See Richards*, 21 F.3d at 1056-58 (holding plaintiff's contention proposed alternative tire design was safer than tire design in question because other tire manufacturers used proposed alternative design was insufficient to maintain negligent or wanton design defect claim); *Brest v. Chrysler Corp.*, 939 F. Supp. 843, 847-48 (M.D. Ala. 1996) (granting summary judgment in defendant's favor on negligence, wantonness, and AEMLD claims where plaintiff failed to present any evidence as to whether safe, practical, alternative design to vehicle's soft top existed beyond expert's statement "alternative designs existed").   Because Green has failed to come forth with sufficient evidence to support an element of his design defect claims asserted under the AEMLD and through the common law torts of negligence and wantonness, those claims must fail.

### b. <u>Warning Defect</u>

A critical element of a failure-to-warn claim brought under the AEMLD or through the common law torts of negligence or wantonness is proximate cause. *Bodie v. Purdue Pharma Co.*, 236 Fed. App'x 511, 518 (11th Cir. 2007) (AEMLD and negligence) (citing *Clarke Indus., Inc. v. Home Indem. Co.*, 591 So. 2d 458, 461 (Ala. 1991)); *Sears, Roebuck and Co. v. Harris*, 630 So. 2d 1018, 1030 (Ala. 1993) (negligence and wantonness). To prove an inadequate warning was the proximate cause of his injuries, a plaintiff must demonstrate he would have read and heeded an adequate warning and that by doing so, the accident would have been prevented. *Rodgers v. Shave Mfg. Co., Inc.*, 993 F. Supp. 1428, 1437 (M.D. Ala. 1998) (citing *Deere & Co. v. Grose*, 586 So. 2d 196, 198 (Ala. 1991)). A failure-to-warn claim should not be submitted to the jury absent substantial evidence supporting proximate causation. *Barnhill v. Teva Pharma USA, Inc.*, 819 F. Supp. 2d 1254, 1262 (S.D. Ala. 2011) (citing *Deere*, 586 So. 2d at 198). The mere existence of an inadequate warning does not create a presumption the plaintiff would have heeded an adequate warning. *Barnhill*, 819 F. Supp. 2d at 1262 (rejecting plaintiff's argument to the contrary). Moreover, there is insufficient evidence to support a jury question on proximate cause where it is undisputed that a plaintiff failed to read the warning he alleges is inadequate: If a plaintiff did not read the alleged inadequate warning, there is no evidence from which a reasonable juror could infer the plaintiff would have read and heeded an adequate warning and, thus, no evidence from which a reasonable juror could infer an adequate warning would have prevented the plaintiff's injury. *Bishop v. Bombardier, Inc.*, 399 F. Supp. 2d 1372, 1385 (M.D. Ga. 2005) (citing *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 971 (Ala. 1985); *Gurley v. American Honda Motor Co.*, 505 So. 2d 358, 361 (Ala. 1987)). On the other hand, where a plaintiff read relevant, existing warnings, there is sufficient evidence for a jury to reasonably

infer the plaintiff would have read additional warnings; and where a plaintiff followed the instructions given, there is sufficient evidence for a jury to reasonably infer the plaintiff would have followed additional instructions. *Harris*, 630 So. 2d at 1030; *Clarke Indus., Inc. v. Home Indem. Co.*, 591 So. 2d 458, 461 (Ala. 1991).

Here, there is a question of fact whether Green read the warning he alleges was inadequate. When deposed, Green initially testified he either never read the warning or could not remember whether he had read the warning. (Doc. 22-1 at 13-14, 21). Later, when questioned by his own attorney, Green testified he did read the warning and believed he had complied with it because the cables were hooked. (*Id.* at 34-35). However, while creating a question of fact as to whether he read the warning in question and, thus, whether he would have read a more precise warning, Green's deposition testimony also demonstrates there is no question of fact as to whether Green would have heeded the more precise warning for which he advocates—one that includes a verbal or visual instruction as to what the cables should be attached and how, as well as the consequences of failure, to use the cables. When shown the language in the safety manual instructing the user to "[a]ttach the safety cables to the bumper or frame of the truck or trailer," Green indicated he would not have understood the verbiage to require the safety cables to connect the ramps to his truck or, at least, that he did not know whether he would have reached that understanding. (Doc. 22-1 at 24). Moreover, when shown the depiction of the steel safety cables connecting the ramps to a truck that is included in the safety manual and asked whether he would have understood from the depiction that the cables should have been connected to the bumper of his truck, Green stated, "From the work that I have done with steel, no, [they] would not be run to the bumper." (*Id.* at 23-24). In light of this testimony, there is not substantial evidence from which a jury reasonably could infer Green

would have heeded the more precise warning for which he advocates. Without sufficient evidence to demonstrate the alleged inadequate warning was the proximate cause of his injuries, Green's failure-to-warn claims asserted under the AEMLD and through the common law torts of negligence and wantonness must fail. *See Yarbrough v. Sears, Roebuck and Co.*, 628 So. 2d 478, 482-83 (Ala. 1993) (holding that where plaintiff read but failed to heed clear, specific warnings and instructions, there was no evidence any other warning or instruction would have been heeded and prevented accident).

### 3. <u>Warranty Claims</u>

Green concedes his breach-of-express-warranty claim is due to be dismissed. (Doc. 28 at 22). Five Star argues Green cannot maintain a breach-of-implied-warranty claim against it because the parties have no privity. (Doc. 21 at 27-28). Green disputes that privity is required to maintain a breach-of-implied-warranty claim against an entity that manufactured but did not actually sell a product, at least in the case of personal injury and not pure economic damage. (Doc. 28 at 22-23). Each party relies on cases from this district court to support its position (*see id.*; Doc. 21 at 27-28), although Five Star notes the case on which Green relies is unpublished (Doc. 30-1 at 23-24). Even assuming a consumer may bring a breach-of-implied-warranty claim against a manufacturer with which he has no privity, Green has failed to come forth with evidence to support such a claim against Five Star.

Alabama law implies a warranty of merchantability into the contract for a sale of goods if the seller is a merchant with respect to the goods in question. *See* Ala. Code § 7-2-314(1). To be merchantable, goods must be, amongst other things, fit for the ordinary purposes for which they are used. *See* Ala. Code § 7-2-314(2). Attempting to reconcile Alabama case law addressing the viability of breach-of-implied warranty claims in light of the development of the AEMLD,

federal courts have held that where evidence shows a product is fit for its intended use, the AEMLD subsumes the warranty claim, even though the product may contain inherent dangers, but that where evidence shows the product was not fit for its intended use, both the warranty claim and the AEMLD claim are viable.  *See Wilson v. Kidde Products Ltd., Co.*, 2012 WL 3542210, at *10 (N.D. Ala. Aug. 14, 2012) (reconciling *Shell v. Union Oil Co.*, 489 So. 2d 569, 571 (Ala. 1986) with *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101 (Ala. 2003) and *Allen v. Delchamps, Inc.*, 624 So. 2d 1065 (Ala. 1993)).  *See also Barnhill*, 819 F. Supp. 2d at 1263 ("In general, Alabama law does not recognize a cause of action for breach of implied warranty of merchantability for inherently dangerous products."); *Bodie*, 236 Fed. App'x at 523-24 ("[C]ourts applying Alabama law have seen fit to subsume U.C.C.-based breach of implied warranty claims into tort and product liability claims, where the product is fit for its intended use and there is no evidence of 'non-merchantability' other than a general allegation that the product contains inherent dangers.").

The ramps were intended to be used to load riding equipment onto the flat bed of a vehicle after being secured to the bumper of the vehicle with steel safety cables.  There is no evidence the ramps were not fit for that use or were otherwise commercially unsuitable.  Green's warranty claim is simply a re-statement of his AEMLD and negligent and wanton failure to warn claims.  Accordingly, Green's breach-of-implied-warranty claim is not viable.

### 4. Loss-of-Consortium Claim

"In Alabama, a loss of consortium claim 'is derivative of the claims of the injured spouse . . . [whereby the] loss-of-consortium claim must fail if [the direct] claims fail.'"  *Rhoton v. 3M Company*, 2015 WL 7770234, at *3 (N.D. Ala. Dec. 3, 2015) (quoting *Flying J Fish Farm v.*

*Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008)).  Given no claim remains from which Green's wife's loss-of-consortium claim may derivate, that claim fails, as well.

## III. <u>Conclusion</u>

For the foregoing reasons, Five Star's motion for leave to file a reply brief in support of its motion for summary judgment that exceeds the page limitation established by the initial order governing this case (Doc. 30) is **GRANTED**.  Five Star's motion to strike the affidavits of Bert Green and Leiss submitted in opposition to its motion to preclude and motion for summary judgment (Doc. 29) is **GRANTED** in part and **DENIED** in part, consistent with this memorandum opinion.  Five Star's motion to preclude Leiss's expert testimony (Doc. 19) is **GRANTED** in part and **DENIED** in part, consistent with this memorandum opinion.  Finally, Five Star's motion for summary judgment in its favor as to all claims  (Doc. 20) is **GRANTED**.  A separate final order will be entered.

**DONE** this 30th day of March, 2016.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE

26